IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Stacie G.,[1]                         )     C/A No.: 1:25-182-DCN-SVH
                                      )
                 Plaintiff,           )
                                      )
        v.                            )
                                      )          REPORT AND
Frank Bisignano,[2] Commissioner      )       RECOMMENDATION
of Social Security Administration,    )
                                      )
                 Defendant.           )
                                      )
_____        )

        This appeal from a denial of social security benefits is before the court

for a Report and Recommendation ("Report") pursuant to Local Civ. Rule

73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. §

405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her claim for

Supplemental Security Income ("SSI"). The two issues before the court are

whether the Commissioner's findings of fact are supported by substantial

evidence and whether he applied the proper legal standards. For the reasons

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.
[2] Pursuant to Fed. R. Civ. P. 25(d), Frank Bisignano is substituted as a party
to this action.

that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On February 10, 2021, Plaintiff protectively filed an application for SSI in which she alleged her disability began on November 15, 2014. Tr. at 128, 255–64. Her application was denied initially and upon reconsideration. Tr. at 140–44, 146–49. On July 2, 2024, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thaddeus Hess. Tr. at 37–62 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 10, 2024, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 7–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 9, 2025. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 44. She completed high school. *Id.* She has no past relevant work. Tr. at 43. She alleges she has been unable to work since October 22, 2020.[3] Tr. at 42.

2.     Medical History

On October 15, 2020, Plaintiff underwent right hip x-rays that showed no acute findings. Tr. at 382–87.

On November 17, 2020, Plaintiff presented to rheumatologist Sherilyn Diomampo, M.D. ("Dr. Diamompo"), for evaluation of osteoarthritis, fibromyalgia, pain, and mild swelling. Tr. at 471. Plaintiff reported mild swelling and pain in her hands, shoulders, lower back, and neck. *Id.* Dr. Diomampo assessed vitamin D deficiency, osteoarthritis, lumbar spine degenerative disc disease ("DDD") with radiculopathy and fibromyalgia, and cervical spine radiculopathy. Tr. at 476. She ordered blood work, stopped Celebrex, increased Gabapentin, and prescribed Etodolac, Omeprazole, Tylenol, Tizanidine, and vitamin D supplements. Tr. at 476–77.

---

[3] Plaintiff amended her alleged disability onset date to coincide with the date she filed an application for disability insurance benefits ("DIB"). Tr. at 42. That application was denied as Plaintiff failed to meet the non-medical requirements for DIB, but she subsequently filed a claim for SSI in February 2021 and requested her disability onset date be preserved based on the filing of the application for DIB.

On December 2, 2020, Plaintiff reported a history of diabetes, paresthesia of the feet, hypertension, fatigue, anxiety, depression, obsessive-compulsive disorder, difficulty sleeping, racing thoughts, occasional palpitations, mild, intermittent leg swelling, nausea, arthralgias, myalgias, back pain, and nervousness. Tr. at 377–78. Nurse practitioner Elizabeth Raynor ("NP Raynor") noted obesity and right hip tenderness. Tr. at 378–79. She assessed hypertension, type 2 diabetes mellitus with hyperglycemia, hyperlipidemia, hypertriglyceridemia, generalized anxiety disorder ("GAD"), moderate major depressive disorder ("MDD"), and nausea. Tr. at 376–77. NP Raynor ordered blood work, prescribed Victoza, Quetiapine, and Zofran, increased Prozac to 40 mg, and increased Seroquel at night. *Id.*

Plaintiff complained of pain in her lower back and left leg, arthralgias, and nausea on December 7, 2020. Tr. at 449–50. Nurse practitioner April Nicole Mann ("NP Mann") observed lumbar tenderness and spasms on exam. Tr. at 450. She assessed left sided sciatica, administered a Toradol injection, ordered physical therapy, and prescribed Tramadol. Tr. at 449.

On January 23, 2021, Plaintiff reported she had become dizzy in the shower, fallen over a shower chair, and hit her right hip three days prior. Tr. at 440. She endorsed pain upon movement of the right hip, difficulty sleeping due to pain, difficulty ambulating, arthralgias, gait problems, dizziness, and weakness. *Id.* Nurse practitioner Whitney Williams ("NP Williams") observed

decreased strength and range of motion ("ROM"), pain with palpation, and tenderness to the right hip, right lower rib pain with palpation, right femur pain with palpation, and a limping gait. Tr. at 440–41. Right rib and hip x-rays were unremarkable. Tr. at 441. NP Williams assessed right rib contusion, right hip contusion, and a fall and ordered a Toradol injection. *Id.*

On February 23, 2021, Plaintiff reported improved lower back pain since starting Tramadol and Tizanidine. Tr. at 461. Dr. Diomampo assessed vitamin D deficiency, generalized osteoarthritis, lumbar spine DDD with radiculopathy and fibromyalgia, and cervical spine radiculopathy. Tr. at 467. She ordered blood work, stopped Etodolac and Omeprazole, and prescribed Gabapentin, Tylenol, Tizanidine, Tramadol, vitamin D supplements, and Voltaren. *Id.* Dr. Diomampo noted she would consider sending Plaintiff to pain management if Plaintiff obtained insurance. *Id.*

On March 8, 2021, Plaintiff reported diabetes, paresthesia of the feet, hypertension, fatigue, obesity, dyslipidemia, anxiety, depression, occasional palpitations, mild intermittent leg swelling, back pain, difficulty sleeping, and nervousness. Tr. at 891. NP Raynor noted improved A1C at 7.6%. Tr. at 893. She stated Plaintiff's triglycerides remained elevated, but had improved significantly with Lovaza. Tr. at 895. She assessed hypertension, rosacea, type 2 diabetes mellitus with hyperglycemia, hyperlipidemia, hypertriglyceridemia, GAD, moderate MDD, insomnia, and

microalbuminuria and prescribed Lisinopril, Metoprolol, Nifedipine, insulin, Glipizide, Victoza, Metformin, Crestor, Lovaza, Trazodone, Quetiapine, and Prozac. Tr. at 889–91.

Plaintiff reported urinary pain, burning, frequency, and urgency, congestion, fever, fatigue, sinus pressure, myalgias, and environmental allergies on May 18, 2021. Tr. at 881–82. NP Raynor observed Plaintiff to demonstrate mild bilateral ear canal redness, a flushed face, and redness, warmth, tenderness, and mild swelling in her left acromioclavicular ("AC") joint. Tr. at 882. She assessed dysuria, a urinary tract infection with hematuria, and left upper extremity cellulitis and prescribed Bactrim. Tr. at 881.

Plaintiff followed up for evaluation of osteoarthritis, fibromyalgia, and lower back and bilateral shoulder pain on July 7, 2021. Tr. at 966. She reported worsened pain with activity, but acknowledged Tramadol and Tizanidine helped her pain. *Id.* Dr. Diomampo assessed generalized osteoarthritis, cervical and lumbar spine DDD with radiculopathy and fibromyalgia, possible obstructive sleep apnea, possible bursitis, vitamin D deficiency, and pain in the hand, feet, knee, bilateral shoulders, and lumbar spine. Tr. at 972. She recommended Plaintiff continue regular exercise and prescribed Gabapentin, Tylenol, Tizanidine, vitamin D supplements, and Tramadol. *Id.*

Plaintiff reported diabetes, paresthesia of the feet, hypoglycemia, hypertension, fatigue, worsening anxiety, depression, occasional palpitations, mild intermittent leg swelling, abdominal pain with movement, back pain, difficulty sleeping, and nervousness on July 8, 2021. Tr. at 863. NP Raynor noted decreased A1C at 6.2%, obesity, and a hernia in the mid-upper abdomen. Tr. at 864–66. She assessed hypertension, type 2 diabetes mellitus with hyperglycemia, hyperlipidemia, hypertriglyceridemia, GAD, moderate MDD, insomnia, and microalbuminuria. Tr. at 862–63. NP Raynor ordered blood work and prescribed Nifedipine, Lisinopril, Glipizide, insulin, Victoza, Metformin, Lovaza, Crestor, Quetiapine, and Trazodone. *Id.*

Plaintiff presented to urgent care for evaluation of neck and right shoulder pain and headaches on July 13, 2021. Tr. at 1051. John Mark Baker, M.D. ("Dr. Baker"), noted obesity, anxious affect, and tenderness, swelling, increased pain, and decreased ROM in Plaintiff's upper trapezius muscle. Tr. at 1058. He assessed a shoulder sprain, administered a Toradol injection, and prescribed Baclofen. Tr. at 1058–59.

Plaintiff reported persistent shoulder pain that worsened with activity on July 15, 2021. Tr. at 956. Dr. Diomampo observed obesity, bilateral subacromial tenderness, and pain with ROM. Tr. at 961. She assessed generalized osteoarthritis, cervical and lumbar spine DDD with

radiculopathy and fibromyalgia, bilateral shoulder pain, and possible bursitis and ordered steroid injections to the bilateral shoulders. Tr. at 962.

Plaintiff presented to Stephen Smith, M.D. ("Dr. Smith"), for a consultative exam on September 21, 2021. Tr. at 537. She reported fibromyalgia, diabetes, hypertension, back pain, sciatica, vitamin D deficiency, anxiety, depression, bilateral rotator cuff problems, autoimmune disease, DDD, constant pain, arthritis in her back, and nerve pain in her hands, feet, neck, and back. *Id.* She said her medications helped on some days and did not help on other days. *Id.* She complained of occasional lower right extremity pain with prolonged standing, some difficulty washing her hair and putting on her clothes, occasional constipation, and headaches. Tr. at 537–38. She endorsed abilities to sit and stand up for up to 15 minutes without difficulty, walk at a normal pace for 10 minutes, lift up to 10 pounds, dress and feed herself, drive as needed, wash dishes, and do laundry. Tr at 538. Dr. Smith recorded normal findings, aside from obesity, slow movement, tachycardia, shoulder discomfort, and lower back pain on heel walk. Tr. at 538–39. He stated, "I do not discount the severity of the patient's medical issues, however on today's exam, I do not find any significant limitations." Tr. at 539.

Plaintiff presented to the emergency room ("ER") following a fall on October 10, 2021. Tr. at 625. She presented with scattered abrasions and a

puncture wound to her right hand and rated pain in her bilateral knees and the left side of her face as a seven out of 10. Tr. at 526.

On October 13, 2021, Plaintiff reported injuries from a recent fall that included a chipped front tooth, abrasions to both knees, and pain and tenderness to her left shoulder, upper arm, and temple. Tr. at 853. She endorsed left ear pressure, occasional palpitations, mild, intermittent leg swelling, arthralgias, back pain, myalgias, environmental allergies, sleep disturbance, and nervousness/anxiousness. *Id.* NP Raynor noted Plaintiff's blood pressure was a little low and had been running low recently and stopped Nifedipine. Tr. at 852. She decreased insulin from 16 units twice a day to six units, as Plaintiff's A1C was down to 5.6%, and indicated she would consider stopping insulin altogether if Plaintiff's A1C continued at that level. *Id.*

On November 29, 2021, Plaintiff reported osteoarthritis, fibromyalgia, and lower back and bilateral shoulder pain. Tr. at 942. She stated her prior injections had not helped. *Id.* Dr. Diomampo noted Plaintiff had been unable to participate in pain management or physical therapy due to her lack of insurance. *Id.* She assessed generalized osteoarthritis, cervical and lumbar DDD with radiculopathy and fibromyalgia, possible obstructive sleep apnea, possible bursitis or rotator cuff disease, vitamin D deficiency, and hand, feet,

knee, bilateral shoulder, and lumbar spine pain and prescribed Gabapentin, Tylenol, Tizanidine, vitamin D supplements, and Tramadol. Tr. at 948.

On December 10, 2021, Plaintiff reported vitamin D deficiency and persistent shoulder pain that worsened with activity. Tr. at 931. Dr. Diomampo noted pain on bilateral shoulder ROM during the exam. Tr. at 936. She ordered bilateral shoulder steroid injections, prescribed vitamin D supplements, and assessed generalized osteoarthritis, cervical and lumbar spine DDD with radiculopathy and fibromyalgia, possible obstructive sleep apnea, bilateral shoulder pain, possible bursitis or rotator cuff disease, and vitamin D deficiency. Tr. at 937.

On January 18, 2022, Plaintiff complained of sinus congestion and pressure, diabetes, paresthesia in her feet, hypoglycemia, hypertension, fatigue, dyslipidemia, obesity, left ear pressure, occasional palpitations, mild intermittent leg swelling, back pain, environmental allergies, difficulty sleeping, nervousness, and anxiety. Tr. at 835. NP Raynor noted obesity and a mid-upper abdominal hernia and assessed hypertension, type 2 diabetes mellitus with hyperglycemia, hyperlipidemia, hypertriglyceridemia, GAD, moderate MDD, insomnia, microalbuminuria, acute rhinosinusitis, and nausea. Tr. at 833–36. She ordered a flu shot and prescribed Metoprolol, Lisinopril, Glipizide, Victoza, Metformin, Lovaza, Crestor, Quetiapine, Trazodone, Pristiq, Zithromax, and Zofran. Tr. at 833–35.

10

Plaintiff presented to the ER on February 10, 2022, after developing syncope and falling. Tr. at 552. She demonstrated a closed head injury with mild bleeding and reported lightheadedness, weakness, moderate and constant headaches, nausea, vomiting, constipation, and shortness of breath. *Id.* The attending physician observed an occipital scalp abrasion with controlled bleeding and obesity. Tr. at 554. A head computed tomography ("CT") scan was negative. Tr. at 582. A CT scan of Plaintiff's cervical spine showed no acute fractures or subluxation. *Id.* Chest x-rays were negative. *Id.* An electrocardiogram ("EKG") was normal. *Id.* The attending physician assessed syncope and collapse, hypotension, lightheadedness, GAD, moderate MDD, type 2 diabetes mellitus with hyperglycemia, gastroesophageal reflux disease ("GERD"), hyperlipidemia, hypertension, vitamin D deficiency, fibromyalgia, hypertriglyceridemia, and autoimmune disease. Tr. at 582. He noted the episode was likely caused by orthostatic hypotension and medications and released Plaintiff with instructions to stop Lisinopril and Metoprolol and prescriptions for Lantus, Coreg, Keflex, Quetiapine, and Desyrel. Tr. at 584–85.

During a visit on February 16, 2022, Plaintiff reported a recent hospitalization due to a syncopal episode, COVID-19, cellulitis, weakness, fatigue, body aches, cough, proteinuria, and left foot redness, swelling, and drainage. Tr. at 827. NP Raynor assessed hypertension, microalbuminuria,

left lower extremity cellulitis, and cough and prescribed Metoprolol, Lisinopril, Keflex, and Promethazine. Tr. at 826–27.

Plaintiff complained of elevated blood pressure, cough, left foot wound with drainage, intermittent low-grade fever, fatigue, sweating, and nausea on February 24, 2022. Tr. at 820. NP Raynor observed mild bulging in Plaintiff's bilateral tympanic membranes. *Id.* She prescribed Bactrim, referred Plaintiff to a general surgeon, and assessed hypertension, type 2 diabetes mellitus with a left midfoot diabetic ulcer, and left lower extremity cellulitis. Tr. at 819–20.

On May 27, 2022, Plaintiff reported diabetes, paresthesia of the feet, hypertension, fatigue, obesity, dyslipidemia, occasional palpitations, mild intermittent leg swelling, back pain, environmental allergies, dysphoric mood, difficulty sleeping, nervousness, and anxiety. Tr. at 809–10. NP Raynor recorded normal findings, aside from obesity and a hernia in Plaintiff's mid-upper abdomen. Tr. at 810–11. She assessed hypertension, type 2 diabetes mellitus, hyperlipidemia, hypertriglyceridemia, GAD, moderate MDD, microalbuminuria, and nausea. Tr. at 808–09. She ordered a mammogram and prescribed Pristiq and Zofran. *Id.*

Plaintiff reported osteoarthritis, fibromyalgia, joint and muscle pain in her bilateral knees and lower back, and vitamin D deficiency on June 15, 2022. Tr. at 918. Dr. Diomampo assessed generalized osteoarthritis, cervical

and lumbar spine DDD with radiculopathy and fibromyalgia, possible obstructive sleep apnea, possible bursitis or rotator cuff disease, vitamin D deficiency, and pain in the hand, feet, knee, bilateral shoulder, and lumbar spine. Tr. at 924. She ordered blood work and bilateral knee x-rays and prescribed Gabapentin, Tylenol, Tizanidine, vitamin D supplements, and Tramadol. *Id.*

On November 17, 2022, Plaintiff reported diabetes, worsening depression, paresthesia of the feet, hypertension, fatigue, obesity, sinus pressure, mild intermittent leg swelling, back pain, environmental allergies, dysphoric mood, and difficulty sleeping. Tr. at 784–85. NP Raynor recorded normal observations, aside from obesity and a mid-upper abdominal hernia. Tr. at 785–86. She noted Plaintiff's A1C had increased to 7.5%. Tr. at 788. She assessed hypertension, type 2 diabetes mellitus with microalbuminuria, hyperlipidemia, hypertriglyceridemia, hypothyroidism, GAD, moderate MDD, and insomnia. Tr. at 782–84. She prescribed Lisinopril, Metoprolol, Trulicity, Glipizide, Metformin, Lovaza, Crestor, Levothyroxine, Quetiapine, Trazodone, Pristiq, and Lamictal. *Id.*

Plaintiff reported bilateral shoulder and knee pain on November 18, 2022. Tr. at 905. She said Gabapentin, Tramadol, and Tizanidine continued to help with some symptoms. *Id.* Dr. Diomampo recorded normal findings. Tr. at 910–11. She assessed generalized osteoarthritis, cervical and lumbar spine

13

DDD with radiculopathy and fibromyalgia, possible obstructive sleep apnea, pain in the hand, feet, knee, bilateral shoulder, and lumbar spine, possible bursitis or rotator cuff disease, and vitamin D deficiency. Tr. at 911. She ordered blood work and bilateral knee x-rays and prescribed Gabapentin, Tylenol, Tizanidine, vitamin D supplements, and Tramadol. *Id.*

Plaintiff reported anxiety, depression, sinus pressure, congestion, and nausea on December 27, 2022. Tr. at 988. She endorsed no improvement in depression and feeling "hyped [] up" with Lamictal. Tr. at 986. NP Raynor assessed moderate MDD, acute rhinosinusitis, dysuria, and vaginal candidiasis. Tr. at 982. She ordered a mammogram and prescribed Tegretol, Augmentin, and Fluconazole. Tr. at 984–85.

Plaintiff reported bilateral shoulder pain that worsened with activity on January 24, 2023. Tr. at 1000. Dr. Diomampo confirmed pain on ROM of the bilateral shoulders on exam. Tr. at 1005. She administered bilateral shoulder steroid injections and assessed bilateral shoulder bursitis and chronic pain. Tr. at 996, 1000, 1006.

On March 6, 2023, Plaintiff presented to urgent care after tripping over her cat and injuring her left hip and hand. Tr at 1033. Nathan Seeberger, M.D. ("Dr. Seeberger"), observed left wrist tenderness with bruising and mild swelling, pain with axial loading of the first proximal phalanx, and mild tenderness to the left hip. Tr. at 1039. X-rays of the left hand showed no

acute fractures and degenerative changes in the distal interphalangeal ("DIP") joint of her left fifth finger. Tr. at 1026. Dr. Seeberger assessed left thumb and hip pain, administered a Toradol injection to Plaintiff's left hip, and prescribed Prednisone to treat her thumb pain. Tr. at 1038.

On April 4, 2023, NP Raynor assessed moderate MDD and prescribed Tegretol. Tr. at 1118–22.

On April 20, 2023, Plaintiff reported diabetes, paresthesia of the feet, hypertension, fatigue, a fall resulting in left hip and thumb pain that worsened with activity, mild intermittent leg swelling, arthralgias, myalgias, back pain, environmental allergies, dysphoric mood, and difficulty sleeping. Tr. at 1096. NP Raynor noted Plaintiff's A1C was significantly better at 6.3% and that she was not experiencing significant problems with Trulicity. *Id.* She suggested increasing Trulicity and discontinuing Glipizide, but Plaintiff did not desire to change her medications. Tr. at 1093. NP Raynor assessed type 2 diabetes mellitus with diabetic polyneuropathy, moderate MDD, hypertension, hypothyroidism, GAD, nausea, left thumb pain, and left DeQuervain's tenosynovitis. Tr. at 1088. She ordered blood work, referred Plaintiff to an orthopedic surgeon, and prescribed Trulicity, Levothyroxine, Pristiq, Tegretol, and Zofran. Tr. at 1099–1104.

Plaintiff presented to the ER with complaints of abdominal pain, syncope, rigors, fever, chills, diffuse myalgia, arthralgia, nausea, vomiting,

diarrhea, and headaches on September 8, 2023. Tr. at 1499. She demonstrated tachycardia on exam. Tr. at 1501. Chest x-rays showed no evidence of acute cardiopulmonary disease. Tr. at 1442. An EKG confirmed sinus tachycardia. Tr. at 1440. The attending physician assistant ordered blood work and several intravenous medications, prescribed Zofran, and assessed acute viral syndrome, acute kidney injury, hypomagnesemia, and lactic acidosis due to dehydration. Tr. at 1499, 1503–04.

On September 11, 2023, NP Raynor assessed type 2 diabetes mellitus with diabetic polyneuropathy and prescribed Trulicity. Tr. at 1085. The following day, she prescribed Tegretol, Pristiq, Glipizide, Levothyroxine, Lisinopril, Metformin, Metoprolol, Lovaza, Zofran, Quetiapine, Crestor, and Trazodone. Tr. at 1075–76.

Plaintiff presented to the ER on December 9, 2023, with nausea and generalized body aches. Tr. at 1395. She left against medical advice. *Id.*

Plaintiff returned to the ER the following day with reports of constant worsening chest pain she rated as a 10, confusion, diaphoresis, fatigue, chills, fever, rhinorrhea, sore throat, anal bleeding, diarrhea, nausea, vomiting, urinary frequency, myalgias, dizziness, and shortness of breath. Tr. at 1144–46. The attending physician observed Plaintiff to demonstrate acute distress, tachycardia, ill and diaphoretic appearance, mild abdominal tenderness, confusion, weak lower extremity strength, and anxious mood. Tr. at 1146–47.

16

An EKG showed sinus tachycardia. Tr. at 1164. A head CT scan suggested chronic microvascular ischemic changes, but showed no acute intracranial findings. Tr. at 1234–35. Chest x-rays showed no acute cardiopulmonary processes. Tr. at 1232. A CT scan of Plaintiff's chest, abdomen, and pelvis showed no acute findings. Tr. at 1237–38. The attending physician assessed chest pain, altered mental status, type 2 diabetes mellitus with diabetic polyneuropathy, hypertension, fibromyalgia, autoimmune disease, hypothyroid, and acute abdominal pain, ordered blood work, and prescribed Tegretol, Cholecalciferol, Pristiq, Benadryl, Gabapentin, Glipizide, Levothyroxine, Lisinopril, Metformin, Metoprolol, Lovaza, Zofran, artificial tears, Quetiapine, Crestor, Tizanidine, Tramadol, Trazodone, and Trulicity. Tr. at 1164–68. Plaintiff was discharged in stable condition on December 11, 2023. Tr. at 1181.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on July 2, 2024, Plaintiff testified she last worked in 2014. Tr. at 43. She stated she was unable to work due to fibromyalgia and pain in her lower back and hips. Tr. at 44. She confirmed her rheumatologist prescribed Tramadol and Gabapentin for pain and Tizanidine as a muscle relaxer. Tr. at 44–45.

The ALJ noted Plaintiff's most recent medical records were from December 2023. Tr. at 45. He asked Plaintiff why she had stopped receiving medical care. *Id.* Plaintiff testified she had no insurance or job, and her brother was no longer able to pay for her medical treatment. *Id.* She said she had applied for treatment at the Anderson Free Clinic, but had not received a response. *Id.* She stated she lived with her mother and son. Tr. at 46.

Plaintiff stated she experienced pain in her back, legs, hips, and shoulders. *Id.* She described pain elsewhere in her body as "[j]ust your normal day getting old, creaky pains." *Id.* She clarified she also had pain in her hands. *Id.* She confirmed she had undergone six surgeries and had received injections in her shoulders and back. *Id.* She said she experienced daily back pain. Tr. at 47. Plaintiff stated Dr. Diomampo continued to refill her medications, although she could not afford to refill them as often as needed. *Id.* She indicated she was treating her pain with Advil, pain cream, and a heating pad. *Id.* She stated she spend 12 hours a day lying on a heating pad. *Id.* She indicated her fibromyalgia pain would flare up on four or five days per week. *Id.* She explained she took hot showers and baths to relieve her pain. Tr. at 48.

Plaintiff testified she had little energy and motivation. *Id.* She confirmed she experienced fibro fog that caused forgetfulness three or four days per week. *Id.* She indicated she had insulin-dependent diabetes. *Id.* She

described daily pain and numbness in her feet. *Id.* She said Gabapentin helped her neuropathic pain, but she was primarily treating it with pain cream because she was out of Gabapentin. Tr. at 49.

Plaintiff estimated she could sit for 10 to 15 minutes at most. *Id.* She said she could stand without leaning on something for no more than 15 minutes. *Id.* She indicated she could walk for 20 to 25 minutes. *Id.* She stated she could lift no more than 10 pounds without experiencing pain. Tr. at 49–50. She said she could use her hands to write or type for no more than 10 minutes. Tr. at 50. She endorsed increased pain with reaching in front and overhead, particularly on the right. *Id.* She estimated she could reach forward for no more than 15 minutes at a time. Tr. at 51.

Plaintiff confirmed she had experienced syncopal episodes and explained the ER doctor felt they were likely caused by her medications. *Id.* She admitted the syncope had improved and she had not experienced any blackout spells since she had stopped taking the medications. *Id.* She denied problems related to her weight. *Id.* She said she had been taking Pristiq for her mental health problems, but was no longer taking it. *Id.* She endorsed continued problems with depression and anxiety, stating she felt lonely, lacked self-esteem, and had crying spells. Tr. at 52.

Plaintiff testified she spent most of a typical day watching television from a recliner. *Id.* She stated she had difficulty and increased pain when

shifting between sitting and standing. *Id.* She indicated her providers had

indicated she had an autoimmune disease, but had not diagnosed her with

lupus or any other specific autoimmune disorder. *Id.* She described radiating

pain in both of her thumbs and said she had previously broken the left one.

*Id.*

        b.     Vocational Expert Testimony

Vocational Expert ("VE") Robert Brabham, Jr., reviewed the record and

testified at the hearing. Tr. at 55–60. The ALJ described a hypothetical

individual of Plaintiff's vocational profile who could perform work at the light

exertional level that would require she lift 20 pounds occasionally and 10

pounds frequently, stand and walk for six hours in an eight-hour workday,

and sit for six hours in an eight-hour workday; frequently handle and finger;

never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs,

stoop, kneel, crouch, and crawl; avoid concentrated exposure to workplace

hazards, such as unprotected heights and moving machinery; understand,

remember, and carry out detailed, but not complex, instructions; and interact

with the public frequently, but  not constantly. Tr. at 56–57. The VE testified

that the hypothetical individual would be able to perform work as a

production inspector, *Dictionary of Occupational Titles* ("*DOT*") No. 222.687-

042, a machine tender, *DOT* No. 920.685-018, and a sorter, *DOT* No. 789.687-

146, with over 17,000, 19,000, and 15,000 positions in the national economy, respectively. Tr. at 57.

The ALJ asked the VE whether his testimony conflicted with job information in the *DOT*. *Id.* The VE testified his testimony regarding climbing restrictions and interaction with the public were based on his experience, as the *DOT* did not directly address those issues. Tr. at 57–58.

For a second hypothetical question, the ALJ asked the VE to consider the same restrictions in the first question, but to assume the individual would be limited to occasional handling and fingering. Tr. at 58. He asked if the same jobs would still be available. *Id.* The VE testified they would not, as only about seven percent of the jobs in the *DOT* require only occasional handling. *Id.* He stated that condition, in combination with the other restrictions would leave no substantial number of jobs available. *Id.*

Plaintiff's counsel asked the VE to indicate the tolerance for absenteeism and off-task behavior in jobs requiring detailed instructions. Tr. at 59. The VE testified eight to 12 absences would generally be allowed annually and any greater number of absences would be problematic in any work setting. *Id.* He further stated eight to 10 percent of time off-task in addition to normal breaks would likely be allowed and any more than that would be problematic. *Id.* He confirmed that a need to lie down on a regular basis would preclude work. Tr. at 59–60.

21

Plaintiff's counsel asked the VE to reconsider the first hypothetical, but to further assume the individual would be limited to occasional reaching in all directions. Tr. at 60. He asked if the additional limitation would affect his prior response. *Id.* The VE said it would reduce the number of jobs. *Id.*

### 2. The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 22, 2020, the amended alleged onset date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: diabetes mellitus with neuropathy, DeQuervain's tenosynovitis, degenerative disc disease, osteoarthritis, fibromyalgia, major depressive disorder, and generalized anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can lift or carry 20 pounds occasionally and 10 pounds frequently with standing and walking for 6 hours of an 8 hour work day and sitting for 6 hours of an 8 hour work day; frequent but not constant handling and fingering; never climb a ladder/rope/scaffold; occasional stooping, kneeling, crouching, crawling, and climbing a ramp or stairs; avoid concentrated exposure to workplace hazards such as unprotected heights and moving machinery; can understand, remember and carry out detailed but not complex instructions; frequent but not constant interaction with the public.

5. The claimant has no past relevant work (20 CFR 415.965).

6. The claimant was born on July 15, 1970 and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged onset date (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 22, 2020, the amended alleged onset date (20 CFR 416.920(g)).

Tr. at 13–24.

## II. Discussion

Plaintiff alleges the Commissioner erred because the ALJ failed to evaluate her fibromyalgia in accordance with Social Security Ruling ("SSR") 12-2p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); SSR 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating

---

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

   B.   Analysis

Plaintiff argues the ALJ failed to evaluate fibromyalgia in accordance with SSR 12-2p. [ECF Nos. 10 at 17–20 and 13 at 1–4]. She maintains the ALJ erred in rejecting her allegations regarding the severity of her symptoms based on the absence of objective findings because fibromyalgia is characterized by a lack of objective findings. [ECF No. 10 at 18–20]. She contends the ALJ did not account for fibromyalgia-related pain and fatigue in assessing her RFC. *Id.* at 20. She claims her case is different from the plaintiff in *Tanika W. v. Kijakazi*, No. 1:22-3691-RMG-SVH, 2023 WL 6050446 (D.S.C. Aug. 23, 2023), *report and recommendation adopted by* 2023 WL 60499982 (Sept. 15, 2023). [ECF No. 13 at 2–3]. She indicates the ALJ

incorrectly interpreted Dr. Diomampo's statement that her medications continued to help with symptoms as an indication that her medication eliminated her pain and fatigue. *Id.* at 5. She claims the Commissioner's argument that the ALJ did not discount her symptoms based on the absence of objective findings is undermined by the ALJ's reference to specific examples of clinical findings that would have plausibly supported her allegations of pain. *Id.* at 6.

The Commissioner concedes the ALJ did not reference SSR 12-2p in his decision, but argues he adequately considered Plaintiff's fibromyalgia in assessing her subjective symptoms. [ECF No. 12 at 5–9]. He asserts the ALJ did not require that Plaintiff's fibromyalgia-related symptoms be validated by objective evidence. *Id.* He indicates the ALJ explained how the other evidence in the record, including Plaintiff's ADLs, treatment modalities, and the nature and frequency of her attempts to obtain medical treatment for symptoms, failed to support and were inconsistent with her allegations. *Id.* at 5–8. He claims the ALJ credited Plaintiff's symptom-related complaints that were consistent with the evidence and rejected those that were not. *Id.* at 7–8.

Fibromyalgia is "a disorder of unknown cause characterized by chronic widespread soft-tissue pain particularly in the neck, shoulders, back, and hips, which is aggravated by use of the affected muscles and accompanied by

weakness, fatigue, and sleep disturbances." *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 91 (4th Cir. 2020) (internal quotation marks and citation omitted). The Social Security Administration ("SSA") issued SSR 12-2p to provide instruction to adjudicators evaluating fibromyalgia claims. SSR 12-2p, 2012 WL 3104869 (2012). SSR 12-2p directs ALJs to the two-step process in SSR 96-7p for evaluating a person's statements about her symptoms and functional limitations. SSR 12-2p, 2012 WL 3104869, at *5. It explains the first step is satisfied by establishing fibromyalgia as a medically-determinable impairment. *Id.* It further indicates the ALJ "must consider all the evidence in the case record" if "objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms." *Id.; see also* 20 C.F.R. § 416.929(c)(2) (providing the adjudicator "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements").

"Fibromyalgia 'symptoms are entirely subjective' and '[t]here are no laboratory tests for the presence or severity of fibromyalgia.'" *Arakas*, 983 F.3d at 91 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Physical examinations generally produce normal results, including full ROM,

no joint swelling, normal muscle strength, and normal neurological reactions. *Id.* at 96.

A claimant who has established fibromyalgia as a medically-determinable impairment is "entitled to rely exclusively on subjective evidence to prove" her symptoms are "so continuous and/or so severe that [they] prevent [her] from working a full eight hour day." *See Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). "At this step, objective evidence is *not* required to find the claimant disabled." *Arakas*, 983 F.3d at 95 (emphasis in original). Thus, an ALJ cannot rely on the absence of objective medical evidence to reject a claimant's allegations regarding the intensity, persistence, and limiting effects of fibromyalgia. *See* SSR 16-3p, 2016 WL 1119029; *see also Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017) (finding an ALJ "improperly increase[s]" the claimant's "burden of proof" by requiring subjective descriptions of symptoms to be verified by objective medical evidence).

However, ALJs are not required to accept claimants' subjective allegations of symptoms in all cases. They must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how

[her] symptoms affect [her]." 20 C.F.R. § 416.929(c)(4). Evidence relevant to the evaluation includes "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." SSR 16-3p, 2017 WL 5180304, at *6. These factors include: (1) the claimant's activities of daily living ("ADLs"); (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

The ALJ found fibromyalgia to be among Plaintiff's severe impairments. Tr. at 12. He acknowledged Plaintiff's complaints of widespread pain during multiple treatment visits. Tr. at 18–20. He noted Plaintiff's reports to Dr. Diomampo regarding the effectiveness of treatment. *See* Tr. at

18–19. He stated Dr. Diomampo adjusted Plaintiff's medications and gave her exercises to perform at home. Tr. at 18.

> The ALJ recognized some of Plaintiff's allegations, writing:

> The claimant alleges disability due to fibromyalgia, diabetes, high blood pressure, osteoarthritis, degenerative disc disease, sciatic nerve pain, ankylosing spondylitis, vitamin D deficiency, chronic anxiety, and chronic depressive disorder (Exhibit B2E). She claims her conditions affect her ability to squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and use her hands (Exhibits B4E/6; B7E/6).
> .

Tr. at 16. However, he ultimately concluded Plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms" were "inconsistent with other evidence in the record." *Id.*

> After setting forth several regulations discussing the burden of proof in disability claims, the ALJ stated:

> Examples of clinical findings that would support an allegation of pain include reduced joint motion, muscle spasm, sensory deficits, and motor disruption. When the results of clinical tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

> The record in this case does not contain disabling medical evidence as required by sections 404.1505 and 416.905 or of any physical impairment which persisted at a disabling level of severity for 12 consecutive months. Although the claimant has some osteoarthritis and degenerative disc disease, she did not display ongoing gait abnormalities or significant difficulty using her upper or lower extremities. While she reported paresthesias in her lower extremities, the record contains no objective medical findings or clinical test documenting any neuropathy, and she

consistently displayed normal motor and sensory functioning. The undersigned has considered the claimant's history of degenerative disc disease, osteoarthritis, and fibromyalgia in limiting her to a reduced range of light work. Due to foot paresthesias and widespread pain, she cannot lift over 20 pounds, should never climb ladders, ropes, or scaffolds, occasionally perform all other postural activities, and should avoid concentrated exposure to hazards. Due to her intermittent hand issues, she is limited to frequent handling and fingering.

Tr. at 19–20. The ALJ subsequently noted he had credited Plaintiff's allegation of "fibro fog," among other impairments, in finding she was "limited to work involving detailed but not complex instructions and frequent but not constant public interaction." Tr. at 21.

This case is easily distinguishable from *Tanika W.* because the ALJ in that case did not discount the claimant's subjective allegations based on a lack of evidence of pain.[6] Although Plaintiff had other impairments in addition to fibromyalgia that could reasonably produce clinical findings, the ALJ did not restrict his emphasis on clinical findings to those impairments, but noted he was searching for "clinical findings that would support an

---

[6] The court found in *Tanika W.* that the ALJ had not erred in noting a lack of abnormal findings where the plaintiff "had additional severe and non-severe impairments often characterized by abnormal clinical exam and laboratory findings." *Tanika W.*, 2023 WL 6050446, at *16. The court further noted the ALJ's references to the plaintiff's providers' descriptions of her during visits, the plaintiff's course of treatment, the fact that no medication was specifically provided to treat fibromyalgia, the plaintiff's self-reported ratings of only mild pain, the plaintiff's reported ADLs, and other specific inconsistencies between the plaintiff's allegations and the record. *Id.* at *16–18. The ALJ included no similar references in this case to explain his finding of inconsistencies between Plaintiff's statements and the other evidence.

allegation of pain." *See* Tr. at 19. Thus, the ALJ impermissibly sought objective evidence of pain. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996) ("There is, of course, a fundamental difference between objective evidence of pain (which is not required) and objective evidence of a medical condition which could cause the pain alleged (which is).").

Here, the ALJ noted an absence of "reduced joint motion, muscle spasm, sensory deficits, and motor disruption," signs generally not present on examination of individuals with fibromyalgia. *See Arakas*, 983 F.3d at 96. Not only did the ALJ "improperly increase [Plaintiff's] burden of proof," *Lewis*, 858 F.3d at 866, he created a burden that was impossible for her to meet.

Contrary to the Commissioner's argument, the ALJ did not explain how the evidence supported his conclusion that Plaintiff's statements regarding the intensity, persistence, and limiting effects of fibromyalgia were inconsistent with the non-objective evidence. The ALJ's decision includes little evaluation of the relevant factors in SSR 16-3p and 20 C.F.R. § 416.929(c)(3). The ALJ cited Plaintiff's statements to her providers regarding the effectiveness of pain medication and injections, but his references reflect their mixed effectiveness. *See* Tr. at 18 ("confirmed that prescribed gabapentin helped her pain overall"; "pain . . . was somewhat improved with medication and over the counter Voltaren gel"), 19 ("reported that shoulder

injections did not help"; reported that prescribed medications were helpful).
The ALJ did not specifically state or explain that the record showed
Plaintiff's pain was effectively controlled by medications such that she could
complete a normal workday and workweek. His discussion of Plaintiff's ADLs
was limited to the following: "For example, the claimant stated that she
requires assistance doing dishes, shopping, laundry, or even dressing due to
pain, and inability to lift over 8 pounds or walk longer than 12 minutes
(Exhibit B4E)." Tr. at 16. He did not explain how these ADLs were
inconsistent with the other evidence or how they suggested Plaintiff had the
ability to complete a normal workday and workweek. To the extent the ALJ
discredited Plaintiff's allegations based on Dr. Diomampo's recommendation
for exercise, he erred in doing so because exercise is often recommended to
treat fibromyalgia. *See Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2009)
("The ALJ next found that Dr. Ali's RFC opinion was inconsistent with his
prescription for physical therapy and aerobic exercise. The first problem with
this reasoning is that this is the appropriate treatment for fibromyalgia.").

In contravention of 20 C.F.R. § 416.929(c)(3), the ALJ did not fully
consider Plaintiff's statements as to the frequency and intensity of her pain
and fatigue, their limitations on her ability to function daily, and the
measures she used to reduce her symptoms. Plaintiff testified she used Advil,
pain cream, and a heating pad to treat her pain, spent approximately 12

hours per day lying on a heating pad, and experienced flare-ups of pain on four to five days per week. Tr. at 47. The ALJ did not cite these allegations or explain how they were consistent or inconsistent with the other evidence of record.

In light of the foregoing, the undersigned recommends the court find the ALJ failed to evaluate Plaintiff's fibromyalgia-related symptoms in accordance with SSRs 96-7p and 12-2p, 20 C.F.R. § 416.929, *Lewis*, and *Arakas*.

III.   Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 1, 2025                               Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).